318 So.2d 777

**Frank BABIES, alias**

**v.**

**STATE.**

**3 Div. 348.**

Court of Criminal Appeals of Alabama.

June 17, 1975.

Rehearing Denied July 29, 1975.

Solomon S. Seay, Jr., Montgomery, for appellant.

William J. Baxley, Atty. Gen. and William A. Davis, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was put to trial upon an indictment which, omitting the formal parts, reads as follows:

"The Grand Jury of said County charge that, before the finding of this indictment, FRANK LEE BABIES, alias FRANK BABIES, alias FRANK L. BABIES, whose name is to the Grand Jury otherwise unknown, did telephone Jimmy Wayne Fulmer and threaten to create an explosion, or falsely informed Jimmy Wayne Fulmer that some other person threatened or intended to create an explosion in their house at 19 Riverside Drive, Montgomery, Alabama, against the peace and dignity of the State of Alabama."

The statute under which the indictment was returned is Title 48, Section 417(3),

(4), Code of Alabama 1940, Vol. 10, 1973 Cumulative Supplement, and, in pertinent parts, is as follows:

"Whoever willfully imparts or conveys or causes to be imparted or conveyed any false information by use of a telephone, knowing the information to be false, concerning an attempt or alleged attempt being made or to be made, to place or cause to be placed any explosive or other destructive substance in or upon any private or public building, transportation facility or place of accommodation, shall be guilty of a felony, and upon conviction shall be imprisoned for a period of not less than one year nor more than five years, and may also be fined not more than $1,000.

"Any of the above offenses may be deemed to have been committed at either the place at which the telephone call or calls were made, or at the place where the telephone or calls were received. (1963, p. 1284, appvd. Sept. 16, 1963.)"

Throughout the trial below, including arraignment, appellant was represented by a court-appointed lawyer. He pleaded not guilty. After conviction he was sentenced to three years imprisonment and gave notice of appeal and requested that his sentence be suspended pending appeal. New counsel represents him on appeal.

The facts are in sharp dispute. Mrs. Bessie Fulmer lived at 19 Riverside, a housing project, in the City of Montgomery, on June 27 and 28, 1972. She testified that she had a straight telephone line and on those two days she received numerous telephone calls containing threats and obscenities that she was ashamed to repeat.

She further testified that the callers were Negroes, one boy and one girl. On the 28th of June a male voice called and threatened to gas her home at seven o'clock that night. She got another call at seven saying they were going to bomb her home at twelve o'clock that night and get her when she ran out. She got in touch with the Police Department and was advised to contact the telephone company and get them to put a "tap" or "trap" on her telephone so the number of the callers could be traced. She contacted the telephone company and they sent a card to be signed by her consenting to this procedure. She received the card, signed it, and returned the card to the telephone company.

On many occasions her son would be at her home when these calls were received and she would hand the receiver to him and he would talk to the male caller. Sometimes these calls would last from thirty minutes to an hour.

Mr. Howard F. Rice, a special agent for the Federal Bureau of Investigation, was employed in the security department of South Central Bell Telephone Company. He testified that he received a phone call from Mrs. Bessie Fulmer on June 27, 1972, and she stated that her residence was receiving threatening telephone calls to the effect that they were going to burn her house and bomb her house. She requested assistance from the company to use their tracing equipment to try to identify where the calls were coming from. They put a trace on the telephone.

From the record:

"Q. Would you explain to the jury how this tracing equipment works, please, sir?

"A. In a normal telephone conversation the person that makes a call controls the connection so that when the person who makes the call hangs up the connection breaks. We go in and we put tracing equipment on the line which reverses this entire thing. Now the person receiving the call controls the connection and as long as the person receiving the call leaves their phone off the hook the connection is still intact. The caller can hang up but the connection is still there and it will hold for five minutes, five hours or five days, as long as we want it to hold until we clear it. This is the

type of equipment we placed on the Fulmer line. ·

"Q. Were any instructions given to the people there at the Fulmer house at that time?

"A. Yes. We explained to them that if they received a call that they would have to leave their phone off the hook and get to another telephone and notify us.

"Q. All right, sir. Now, were any traces successful during this period that the tracing equipment was on?

"A. Yes, sir.

"Q. All right. Would you tell the jury to what addresses and what times these traces were made?

"A. On June 27 at approximately six twenty-five p. m. a successful trace was made back to 263–1522, which is listed to Charlotte James at 1503 Ruben Street.

"Q. All right, sir.

"A. On the following day, June 28, at approximately three twenty-five p. m. a successful trace was made back to 265–4042, which is listed to Lizzie Mae Mack at 1544 Ruben Street.

"Q. About what time was that second trace?

"A. Approximately three twenty-five p. m.

"Q. All right, sir. Were the police notified?

"A. Yes, sir.

"MR. THOMAS: All right, sir. That is all.

"CROSS-EXAMINATION

"BY MR. CARLTON:

"Q. Mr. Rice, is this tracing a hundred percent accurate?

"A. Once a trace is made, once the machinery locks two lines together, yes, sir.

"Q. Is it possible that a call could be made and traced to a different number?

"A. Well, we are now talking about the ability of our people in physically making the trace?

"Q. Right.

"A. On these particular traces in a serious case, which we consider serious, there is a double trace made before anything is resolved. He traces it once, he traces it twice, and in this particular case I directed that the line be left open, that the trace not be cleared, that it be left open in order for the authorities to complete their investigation, and that line was left open.

"Q. And this is a one party line that was being traced?

"A. Yes, sir.

"Q. Is it possible for another telephone to break in on that?

"A. Nobody else can call either one of those parties. They just get busy signals because both lines are open.

"Q. On many occasions we pick up a telephone to place a call and we hear somebody on the line playing music. What is that? Is that a one party line?

"A. I am not quite sure. I know what you are speaking of, I have heard it myself. There are various explanations as to how these things can happen, from anything to the cable being wet to various explanation. (sic) But in this particular situation I would say the equipment is a hundred percent correct and the proof of the pudding is in the fact that the line was left open and it was talked over.

"Q. And you say you traced a call to Charlotte James at 265–2122. What time was that?

"A. This was on the 27th.

"Q. At what time?

"A. This call was made at approximately six twenty-five p. m.

"Q. What about the call to Lizzie Mae Mack?

"A. You mean from the Mack Residence?

"Q. Right.

"A. On June 28 at approximately three-twenty-five p. m.

"MR. CARLTON: That is all.

"REDIRECT EXAMINATION

"BY MR. THOMAS:

"Q. Did you notify the Fulmer people that the trace on the 27th had been made, or did you notify the police?

"A. We notified the police. We do not go back—there is a company policy, and I am sure you understand why, we do not go back to a victim and tell them where their calls are coming from. We give it to the law enforcement agencies."

The son of Mrs. Fulmer, Jimmy Wayne Fulmer, testified that on June 28, 1972, he got another telephone call and he recognized the male voice who had been calling and making the threats relative to burning and bombing their house. This call came around six to six-thirty. As instructed by Detective W. W. Strane, he kept the telephone line open and went to another telephone the officer had given him to call so that the police could trace the call. When he returned, he heard the same voice and also Mr. Strane's.

The police officers went to 1544 Ruben Street (one of the places where the calls were traced) on June 28, 1972. They found appellant sitting in the livingroom in reach of a telephone. The officer informed him that they had received complaints about threatening telephone calls from this number to the Fulmer's residence. Appellant immediately denied making any such calls. The officer asked if there was another telephone in the house and was told there was an extension upstairs. The officer went upstairs and found appellant's brother and told him about the complaints and asked him if he was willing to go to Police Headquarters and he readily agreed. The officers had considerable difficulty in getting appellant to go but he finally agreed to go. When they arrived at Police Headquarters, both brothers were put in an office and each were given the *Miranda* rights and warnings and they both replied they knew their rights. At this time no arrests had been made.

Jimmy Wayne Fulmer went to Police Headquarters and he did not see either appellant or his brother. Fulmer was put in another office and Strane told him not to swear out a warrant until he was sure that he could identify the voice of the caller. The officer told Fulmer that he was going to dial the number of the office he was in and put one of the suspects on the phone and for him to talk to the suspect and then he would put the other suspect on the phone and allow him to hear this suspect talk and determine if he recognized anyone's voice. Fulmer had no knowledge of which of the brothers was going to be put on the phone first.

Actually Strane put appellant on the phone first and after a few minutes of conversation, Fulmer told Strane that this was the voice that belonged to the man who had threatened to burn and bomb his mother's home. Strane told Fulmer he was going to put the other man on the phone and let him have a conversation with the second suspect anyway. Charles Babies got on the phone and after he and Fulmer talked a few minutes, Fulmer again told Strane it was the first man who had done the calling.

Fulmer further testified that he knew the caller was a black man because he told him he was black.

Appellant and his family testified for the defense. Appellant denied making any such calls and stated that he was not even at his mother's house at the times these threatening phone calls were allegedly received by the Fulmers. His family gave supporting testimony.

Appellant contends that the police procedures used in obtaining the voice identification of the appellant were so impermissibly suggestive as to create a substantial risk of misidentification. We do not agree with this contention.

The facts in the instant case indicate that the police operated in a permissible manner in their investigation and subsequent establishment of appellant's identification. The police officers knew that a telephone trace had been placed on the complaining party's telephone. The reliability of the telephone trace was established at trial through the testimony of Howard Rice, an ex-F.B.I. agent, and an employee of the Security Department of South Central Bell Telephone Company. The investigating officer was instructed to go to Hall and Ruben Streets and to wait for further instructions in regard to an address from where traced telephone calls were being made.

On June 28, 1972, a successful trace was made by the telephone company from the Fulmer residence to 1544 Ruben Street. Detective Strane went to this address and saw appellant sitting by the telephone. Strane handed the receiver to appellant and he agreed to talk after being told the complaining party was on the other end of the line. Appellant spoke to the complaining witness, Fulmer, who then and there positively identified appellant as the guilty party.

In *Stallworth v. State,* 52 Ala.App. 619, 296 So.2d 243, we held that the conflicting evidence concerning a threatening telephone call made and presented a question for the jury's determination and that is true in this case.

Voice identification of a suspect by telephone conversations was approved by the Supreme Court of Alabama in *Dentman v. State,* 267 Ala. 123, 99 So.2d 50, wherein the court said:

"Speaking generally, communications through the medium of the telephone may be shown in the same manner, and with like effect, as conversations had between individuals face to face, but the identity of the parties against whom the conversation is sought to be admitted must be established by some testimony either direct or circumstantial."

See also *Wilson v. State,* 20 Ala.App. 137, 101 So. 417.

In this case Fulmer made a positive identification of appellant's voice while the telephone line was open and also made a positive identification of his voice while in a separate office at Police Headquarters.

There was no motion to exclude the state's evidence; there was no motion for a new trial; there were no exceptions reserved to the oral charge to the jury; there were no adverse rulings on the admission of evidence. There was a request for the affirmative charge but in the light of what we have said clearly the case was properly submitted to the jury.

The case is affirmed.

Affirmed.

TYSON, DeCARLO and BOOKOUT, JJ., concur.

CATES, P. J., not sitting.